**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| AWP, Inc., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 1:16-CV-332 (TSE/MSN) |
| | ) |
| SJK SERVICES LLC, et al., | ) |
| | ) |
| Defendants. | ) |

## BRIEF IN SUPPORT OF MOTION TO DISMISS
## FILED BY DEFENDANT DAVID S. RICE

Defendant David S. Rice, by counsel and pursuant to Rule 12(b)(6) of the Federal Rules of

Civil Procedure, respectfully submits this Brief in Support of his Motion to Dismiss.

## SUMMARY OF PLAINTIFF'S ALLEGATIONS

The Plaintiff in this case, AWP, Inc., brings before this Court a set of formulaic allegations

seen many times before.  Identifying itself as a "security company" based in Ohio, AWP alleges that

its former employee, David S. Rice, and his colleagues at his new employer, SJK Services LLC, have

violated contracts, stolen trade secrets, engaged in a far-flung conspiracy, and committed other torts

and transgressions in the course of setting up a small traffic control company in Reston, Virginia.

But like so many cases of this nature, AWP rests its legal claims on a set of threadbare allegations,

most of which are set forth on the basis of AWP's alleged "information and belief." *See* Complaint

¶¶ 36, 37, 38, 39, 43, 44, 45, 47, 51.  Even a quick glance at the Complaint makes it evident that

AWP's allegations are not sufficient to support the legal claims advanced.

AWP alleges that it provides "utilities, municipalities and private contractors with a variety

of services including traffic control, special events, engineering and design, consulting, and safety

and training," as well as equipment rental and sales.  Complaint ¶ 11.  AWP alleges that it operates in 18 states and that its future growth and success is dependent on a variety of "confidential and proprietary trade secret information," including "strategic plans for developing and marketing its services, customer and prospective customer lists, customer information and preferences, pricing, and employee compensation and benefits arrangements."  Complaint ¶ 13.

According to the Complaint, Mr. Rice worked for AWP in the position of a "facility manager" until his resignation on December 4, 2015.  Complaint ¶¶ 17, 26.  The sum total of AWP's substantive allegations concerning Mr. Rice's duties can be found in a mere two paragraphs of the Complaint.  AWP alleges that Mr. Rice's "responsibilities included managing a staff of 30 or more employees, ensuring safety compliance, developing close relationships with existing customers, and identifying potential opportunities for growth" and that Rice "also had responsibilities for some of AWP's special events services, which is a growing part of AWP's business."  Complaint ¶ 17.  AWP alleges that "[i]n discharging his responsibilities, Rice accessed AWP's confidential and proprietary trade secret information including, without limitation, its strategic plans for developing and marketing AWP's products and services, customer lists, customer information, pricing, and employee compensation."  Complaint ¶ 19.

AWP alleges that to protect its business from unfair competition by Mr. Rice, it required him to sign a Confidentiality, Non-Competition & Non-Solicitation Agreement (hereinafter, the "CNNA").  The CNNA includes a variety of broad post-employment restrictive covenants, including provisions titled "Confidentiality," "Non-Compete," "Non-Solicitation of Employees," and "Non-Solicitation of Clients and Customers."  Complaint ¶¶ 20-24.

AWP alleges that in violation of these obligations Mr. Rice conspired with  his co-Defendants "to unfairly compete with AWP."  Complaint ¶ 40.  AWP alleges that the Defendants set up SJK Services as a competing entity in September 2015 and, since then, have actively recruited

2

AWP employees and solicited AWP clients.  Complaint ¶¶ 43, 46, 49.  AWP alleges that if Mr. Rice

is permitted to remain employed by SJK Services, "the continued use and disclosure of AWP's

confidential and proprietary trade secret information by Defendants is inevitable."  Complaint ¶ 52.

      For the reasons set forth below, AWP's allegations are insufficient to state a claim for which

relief can be granted.  AWP's factual allegations, even if true, are not sufficient to support the nearly

limitless post-employment restrictions set forth in the CNNA, nor do they establish that Mr. Rice

misappropriated any trade secrets, engaged in a conspiracy, or committed any act that constitutes

unfair competition under Virginia law.

## LEGAL STANDARD

      The Rule 12(b)(6) standard is well-known to this Court.  "The purpose of a Rule 12(b)(6)

motion is to test the sufficiency of a complaint."  *Edwards v. City of Goldsboro*, 178 F.3d 231,

243 (4th Cir. 1999).  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that

allows the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  *Id*.  This analysis is context-specific and requires "the reviewing court to draw on its

judicial experience and common sense." *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir.

2009).  Clearly, however, a pleading that merely offers "labels and conclusions," or "a formulaic

recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555.

Likewise, "a complaint [will not] suffice if it tenders 'naked assertion[s]' devoid of 'further

factual enhancements.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

      Application of this standard in this case requires the dismissal of all claims asserted

against Mr. Rice.

# ARGUMENT

**I.** **Count I:  The Restrictive Covenants are Overbroad and Unenforceable Under Both Virginia and Ohio Law**[1]

In both Ohio and Virginia, non-compete agreements and other post-employment restrictive covenants are evaluated for enforceability using well-settled principles.

Covenants in restraint of trade are not favored, will be strictly construed, and, in the event of an ambiguity, will be construed in favor of the employee.  *Single Source Packaging, LLC v. Cain*, 2003 Ohio App. LEXIS 4248, *17 (Ohio Ct. App., Sept. 5, 2003); *Cintas Corp. v. Perry*, 2004 U.S. Dist. LEXIS 17842, *35 (N.D. Ill., Aug. 19, 2004) (applying Ohio law); *Omniplex World Servs. Corp. v. US Investigations Servs.*, 618 S.E.2d 340, 342 (Va. 2005); *Modern Env'ts v. Stinnett*, 561 S.E.2d 694, 695 (Va. 2002), *Richardson v. Paxton Co.*, 127 S.E.2d 113, 117 (Va. 1962).  A restrictive covenant may be enforced if it is reasonable; that is, if it is no greater than necessary to protect a legitimate business interest, is not unduly harsh or oppressive in curtailing an employee's ability to earn a livelihood, and is reasonable in light of sound public policy. *Premier Assocs., Ltd. v. Loper*, 778 N.E.2d 630, 636 (Ohio Ct. App. 2002); *American Building Services, Inc. v. Cohen*, 603 N.E.2d 432, 434 (Ohio Ct. App. 1992); *Blue Ridge Anesthesia & Critical Care, Inc. v. Gidick*, 389 S.E.2d 467, 469 (Va. 1990); *Paramount Termite Control Co. v. Rector*, 380 S.E.2d 922, 924 (Va. 1989); *Roanoke Engineering Sales Co., Inc. v. Rosenbaum*, 290 S.E.2d 882, 884 (Va. 1982).  In assessing these factors, courts typically examine more "measurable" aspects of the covenant itself, including: (i) the duration of the restraint; (ii) its geographic scope; and (iii) the scope and extent of the activities being restrained.  *See Blue Ridge Anesthesia*, 389 S.E.2d at 470; *cf. American Building Services, Inc.*, 603 N.E.2d at 434 (listing

---

[1]    The CNNA includes a provision entitled "Governing Law" that incorporates the law of the State of Ohio for purposes of interpretation and enforcement.  CNNA § 3(c).  As noted below in Section I.E of this Brief, however, some aspects of Ohio law violate the public policy of Virginia and therefore cannot be applied in this enforcement action.

several factors, including "time and space," whether the employee possessed trade secrets,

"whether the benefit to the employer is disproportional to the detriment to the employee" and

similar factors) (citing *Raimonde v. Van Vlerah*, 325 N.E.2d 544 (Ohio 1975)).

In both Ohio and Virginia, business interests that will support a reasonably drawn

restrictive covenant include the protection of trade secrets and confidential information and the

protection of customer relationships. *Brentlinger Enters. v. Curran*, 752 N.E.2d 994, 1001 (Ohio

Ct. App. 2001); *Paramount Termite Control Co.*, 380 S.E.2d at 925. However, a company may

not use a restrictive covenant to prevent "ordinary competition." *Premier Assocs., Ltd.*, 778

N.E.2d at 635-636. Moreover, post-employment restrictions must be narrowly tailored not just

in the general sense, but also such that they are tied directly to, and no broader than necessary to

protect, the business interest at issue. *See Jacono v. Invacare Corp.*, 2006 Ohio App. LEXIS

1501, **16-17 (Ohio Ct. App., Mar. 30, 2006) (holding that employer "did not possess a

compelling business interest that justified a nationwide three-year restrictive covenant"); *Nortec

Communications, Inc. v. Lee-Llacer*, 548 F.Supp.2d 226, 230 (E.D. Va. 2008) (the first step in

the analysis is to determine if "the restrictive covenants at issue are sufficiently narrowly drawn

to protect [the company's] legitimate business interests").

Significantly, Virginia and Ohio courts have found covenants unreasonable when they

prohibit employees from performing services in noncompetitive roles. *See, e.g., Omniplex*, 618

S.E.2d at 342-43; *Modern Environments*, 561 S.E.2d at 696; *American Building Services, Inc.*,

603 N.E.2d at 435 (finding unreasonable the covenant's prohibition of any employment with a

competitor). Indeed, the issue has become so important that in *Omniplex* the Virginia Supreme

Court rejected enforcement of a restrictive covenant on the basis of a hypothetical example

created by the Court *sua sponte* that had no bearing on the actual facts of the case. *Omniplex*, 618

S.E.2d at 342-43 (noting that the restriction would preclude the employee – who was a security control officer – from working as a delivery driver under certain circumstances). Similarly, in *Cintas Corp. v. Perry*, 2004 U.S. Dist. LEXIS 17842, \*\*40-41 (N.D. Ill. Aug. 19, 2004), a federal court applying Ohio law invalidated a restrictive covenant in part because it prohibited the former employee's employment in a "managerial or professional position," a phrase the court concluded "is undefined" and includes positions outside of sales, the only profession in which the former employee had worked for the employer. *Id.* at \*\*40-41. Additionally, a restrictive covenant that is ambiguous or otherwise subjects the bound individual to questions and uncertainty concerning his obligations may not be enforced. *Roto-Die, Inc. v. Lesser*, 899 F.Supp. 1515, 1521 (W.D. Va. 1995) (an ambiguous restrictive covenant may not be enforced because "[t]he mere act of subjecting the employee to the uncertainty of an ambiguous provision offends public policy.").

Whether or not a covenant restricting competition is enforceable is a question of law. *Jacono*, 2006 Ohio App. LEXIS 1501 at \*16 (citing factors considered by trial courts to determine enforceability of restrictive covenants)*; Home Paramount Pest Control Cos. v. Shaffer*, 718 S.E.2d 762, 763-764 (Va. 2011); *Omniplex*, 618 S.E.2d at 342.

### A.   <u>Non-Compete Provision</u>

Section 2(c) of the CNNA provides that during his employment, and for a period of twelve months thereafter, Rice will not:

> as principal, or in conjunction with any other person, firm, partnership, corporation or other form of business organization or arrangement (whether as a shareholder, partner, member, principal, agent, lender, director, officer, manager, trustee, representative, employee or consultant), directly or indirectly, be employed by, provide services to, in any way connected, associated or have any interest of any kind in, or give advice or consultation to any Competitive Business within a 120-mile driving distance from Employee's regularly assigned place of duty or office.

Complaint ¶ 22; CNNA ¶ 2(c).

This restriction is far too broad in light of AWP's allegations concerning its business and business interests.  No facts alleged in the Complaint support a post-employment restriction of this breadth.

### 1.    *"In any Capacity" and "The Janitor Problem"*

First, the non-compete expressly prohibits Rice's employment in any capacity with any "Competitive  Business."[2]  The CNNA specifically restricts Rice from being a "shareholder, partner, member, principal, agent, lender, director, officer, manager, trustee, representative, employee or consultant" of any such company, and from becoming "employed by" or "provid[ing] services to" any such entity.  The provision is not limited to positions similar to or competitive with the position Rice held for AWP.

Courts routinely strike down covenants that restrict an individual from accepting employment in a non-competitive position or in a position dissimilar to that held with a former employer.  *See, e.g., American Building Services, Inc.*, 603 N.E.2d at 435 ("the portion of the covenant between the parties which prohibits appellant from becoming employed by any business which directly competes with appellee for two years after termination is unreasonable"); *see also Omniplex*, 618 S.E.2d at 342-43; *Modern Environments, Inc.*, 561 S.E.2d at 696; *Strategic Res. v. Nevin*, 2005 U.S. Dist. LEXIS 30985 *5 (E.D. Va. Nov. 23, 2005); *Cintas Corp.*, 2004 U.S. Dist. LEXIS 17842, **40-41 (applying Ohio law).  Indeed, this Court has held that the enforcement of a non-compete is permissible only "to the extent that the proscribed functions are the same functions as were performed for the former employer."  *Lanmark*

---

[2]      The CNNA defines "Competitive Business" to include "any business which competes, directly or indirectly, with any aspect of AWP's business of providing traffic control services and equipment." CNNA § 2(a).

*Technology, Inc. v. Canales,* 454 F.Supp.2d 524 (E.D. Va. 2006) (quotation omitted) (emphasis added) (Ellis, J.).  This Court reasoned:

> [W]here, as here, the non-compete clause effectively prohibits the employee from working in virtually any capacity for a competitor, it is not narrowly drawn to protect the employer's legitimate business interest, and thus, is functionally overbroad.

*Id.* at 530.

Thus, the CNNA suffers from what has become known as the "janitor" problem – if a restrictive covenant would prohibit the individual from working for a competitor in any capacity, even as a janitor, it is fatally overbroad.  *See, e.g., Lanmark Technology,* 454 F.Supp.2d at 530 n.12; *Cliff Simmons Roofing, Inc. v. Cash*, 49 Va. Cir. 156, 157-58 (Va. Cir. Ct. 1999); *cf. American Building Services, Inc.*, 603 N.E.2d at 435.  In short, the CNNA prohibits Mr. Rice from accepting employment with a competing company in <u>any</u> <u>position</u> <u>of</u> <u>any</u> <u>kind</u> – whether as an accountant, a salesperson, an IT technician, a quality control supervisor, a trainer, or, indeed, even as a janitor.  AWP has alleged no facts that support such a broad restriction, and for this reason alone, the CNNA is overbroad.

### 2.      *Not Limited to "Employment"*

The "in any capacity" nature of Section 2(c) is only part of the problem, however. Putting aside the question of "employment," the CNNA also prohibits Mr. Rice from being "associated" with, from "hav[ing] any interest of any kind in," from "giv[ing] advice or consultation to," and from being "in any way connected" with any such business, either "directly or indirectly."  These all-encompassing terms make the restriction almost impossibly broad, and certainly far broader than permissible given the facts alleged in the Complaint.  For example, the non-compete, among other things, prohibits Mr. Rice from working for a company that sells traffic barriers to companies in the traffic control business, including AWP itself, if his company

also sells traffic barriers to an AWP competitor.  It also prohibits him from working for a marketing firm that provides marketing advice and creates advertising materials for traffic control companies that compete with AWP.  The restriction also prevents him from working for a construction company that hires outside vendors such as AWP's competitors to provide traffic control services.  Section 2(c) even prohibits Mr. Rice from being a passive stockholder in a publicly traded company that competes with AWP.

Obviously, none of these activities would actually place Mr. Rice in competition with AWP; yet, these activities are prohibited by the CNNA just the same.  There are no facts alleged in the Complaint that, if true, support AWP's efforts to prohibit Mr. Rice from working in such a broad array of non-competitive positions.

### 3.  *Vagueness and Ambiguity*

Additionally, these added restrictions render the clause unacceptably vague.  There is no reasonable way for Mr. Rice to determine what AWP means when it tells him he is prohibited from being "in any way connected with" or having "any interest of any kind in" a competing business.  This clause can even be read to prohibit Mr. Rice's spouse from working for a competing business.  In short, it is impossible for Mr. Rice to know what he can, and cannot, do.

### B.  Customer Non-Solicitation Provision

Section 2(e) of the CNNA states that for a period of twelve months following his employment with AWP, Rice will not:

> as principal, or in conjunction with any other person, firm, partnership, corporation or other form of business organization or arrangement (whether as shareholder, partner, member, lender, principal, agent, director, officer, manager, trustee, representative, employee or consultant), directly or indirectly: (i) solicit or accept any business, in competition with AWP, from any person or entity who was an existing or prospective customer or client of AWP at the time of, or at the time during the twelve (12) months preceding, [Rice's] termination of employment; or (ii) request, suggest, or deliberately cause any of AWP's clients

or customers to cancel, reduce, change the terms of or terminate any business
relationship with AWP involving services or activities which were directly or
indirectly the responsibility of [Rice] during [Rice's] employment.

Complaint ¶ 24; CNNA ¶ 2(e).

For three distinct reasons, Section 2(e) is also broader than necessary to protect the

business interest identified in and supported by the Complaint.[3]

First, the clause prohibits Mr. Rice from soliciting or accepting business from any entity

that was a customer of AWP, even customers with which Mr. Rice had had no interaction and

had acquired no confidential information.  Indeed, the restriction prohibits his interaction with

AWP customers that are not even known by Mr. Rice to be AWP customers.  Considered along

this metric, the allegations in the Complaint do not support such a broad prohibition.  To the

contrary, according to the Complaint:  (i) AWP is the largest comprehensive traffic control

company in the United States; (ii) AWP employs 2,500 employees across 18 states; (iii) AWP

offers traffic control services to "nearly every major public utility from Michigan to New York

and south to Florida"; (iv) AWP has two regional headquarters in Ohio and Georgia and more

than 40 branch offices across its territory; and (v) AWP provides services that range from traffic

control to engineering and design to consulting to safety training to equipment sales.  Complaint

¶¶ 10-11.  In stark contrast to AWP's broad, nearly national, operations, Mr. Rice supervised 30

employees in a facility in Manassas, Virginia.  He was responsible for safety compliance, some

special events services, identifying growth opportunities, and had some relationships with

"existing customers."  Complaint ¶¶ 17-18.  AWP does not allege that Mr. Rice had

responsibilities or relationships related to all lines of business, for all customers, in all 18 states.

Accordingly, Section 2(e)'s broad, national prohibition on solicitation of all AWP customers is

---

[3]      Non-solicitation clauses "are reviewed under the same standards as those developed for non-
competition clauses because solicitation is a form of competition." *Strategic Resources, Inc.*, 2005 U.S.
Dist. LEXIS 30985 at *10-11 (E.D. Va. 2005).

overbroad, insofar as it applies to Mr. Rice.  *See, e.g., BB&T Insurance Services, Inc. v. Thomas Rutherfoord, Inc.*, 80 Va. Cir. 174 (Va. Cir. Ct. 2009) (refusing enforcement of non-solicitation provision because it prohibited the former employee from selling insurance products to anyone who had ever purchased BB&T insurance, regardless of whether the former employee had interacted with those customers).

Second, the clause expressly prohibits Mr. Rice from accepting business from "prospective customer[s]."  By definition, a "prospective customer" is <u>not</u> a customer.  Given its ordinary meaning, a "prospective customer" is nothing more than a "potential customer," that is, a person or entity that might, some day and in some way, need any of AWP's broad range of services in any of the 18 states – or beyond – in which it does or might do business.  Courts routinely find such broad restrictions cannot be enforced.  *See, e.g., American Building Services, Inc.*, 603 N.E.2d at 434 ("the term "prospective customer" is broad and overly inclusive"); *Phoenix Renovation Corp. v. Rodriguez*, 439 F.Supp.2d 510, 521-22 (E.D.Va. 2006) (invalidating non-solicitation clause prohibiting employee from providing services to "any present or prospective customer" because the phrase could cover "anyone in [the] thirty-eight states [in which Phoenix does business] who might call upon Phoenix in the future . . . ."); *cf. Professional Investigations & Consulting Agency, Inc. v. Kingsland*, 591 N.E.2d 1265, 1269 (Ohio Ct. App. 1990) (invalidating covenant that prohibited solicitation of any "past clients of [employer] regardless of whether [employer] had a business relationship with the client at or near the time of [employee's] discharge").

Third, and perhaps most problematic, the clause prohibits Mr. Rice's interaction with any entity that was a customer or prospective customer at any time "during the twelve (12) months <u>preceding</u> [Rice's] termination . . ."  In other words, any AWP customer that <u>fired</u> AWP, or that

was <u>fired</u> <u>by</u> AWP, during the final year of Mr. Rice's employment is rendered off-limits, even if the termination of that relationship had nothing to do with Mr. Rice.  AWP has no protectable interest in <u>former</u> <u>customers</u>.  *See, e.g., Lasership, Inc. v. Watson*, 79 Va. Cir. 205, 215 (Va. Cir. Ct. 2009) (finding unreasonable non-solicitation clause that prohibited employee from contacting any customer invoiced in employee's last year of employment); *cf. Premier Assocs., Ltd.*, 778 N.E.2d at 637 (finding that the right to enforce a covenant ends when the business to which the covenant was ancillary has been terminated).

In short, Section 2(e) prohibits Mr. Rice from doing business with an entity outside of Virginia for which he has never performed service and of which he has never heard, even if the entity purposefully discontinued its relationship with AWP up to 12 months before Mr. Rice left the company.  Under no circumstances can AWP prove that it has a legitimate business interest in such a broad set of restrictions.

## C.     Employee Non-Solicitation Provision

Section 2(d) of the CNNA, which purports to prohibit Mr. Rice from soliciting AWP employees, states that for a period of twelve months following his employment with AWP, Rice will not:

> directly or indirectly (i) solicit, employ or retain, or have or deliberately cause any other person or entity to solicit, employ or retain, any person who is employed or is providing services to AWP at the time of [Rice's] termination of employment or was or is providing such services within the twelve (12) month period before or after [Rice's] termination of employment or (ii) request, suggest or deliberately cause any employee of AWP to breach or threaten to breach terms of said employee's agreements with AWP or to terminate his or her employment with AWP.

Complaint ¶ 23; CNNA ¶ 2(d).

As with Section 2(e), Section 2(d) is dramatically overbroad in its sweeping set of prohibitions.

First, the provision prohibits Mr. Rice from soliciting, employing, or retaining not only AWP employees, but also vendors, merchants and consultants of any nature who are "providing services" to AWP.  Thus, Section 2(e) prohibits Mr. Rice from engaging the services of a payroll provider, a Human Resource consulting firm, and even a contract painting company that has provided services to AWP during the delineated period.  Second, the clause prohibits the solicitation or retention of any employee who was employed by, or vendor who provided services to, AWP at any time during the one-year period <u>before</u> Mr. Rice left AWP <u>and</u> the one-year period <u>after</u> he left.  Thus, Mr. Rice cannot solicit, employ or retain a former AWP employee or vendor who left AWP up to twelve months before Mr. Rice left AWP, even if the employee or vendor is, at the time of the solicitation, employed by or providing services to another company.  Similarly, Mr. Rice cannot solicit or accept business from a vendor that did not begin providing services to AWP until <u>after</u> he resigned.  There are no facts alleged in the Complaint that give rise to a competitive or protectable business interest in such a restriction.

   **D.**     **Plaintiff has not alleged Facts Sufficient to Support its Claim that Rice has Breached the Confidentiality Provision of the CNNA**

Pursuant to paragraphs 2(a) and 2(b) of the CNNA, Rice agreed that he would not "at any time, either during the Term or thereafter, divulge, use, publish, or in any other manner reveal" this confidential and proprietary trade secret information "directly or indirectly, to any person, firm, corporation or any other form of business organization or arrangement and keep in the strictest confidence."  Complaint ¶ 21; CNNA ¶¶ 2(a), 2(b).  AWP alleges that Rice has also breached this provision; however, the sum total of AWP's allegations in this regard are contained in Paragraph 45 of the Complaint, wherein AWP alleges: "Upon information and belief, Rice used AWP's confidential and proprietary trade secret information to help start SJK and to compete against AWP."

These factual allegations are insufficient to state a claim for breach of contract. First, the allegations are made "on information and belief," code words that mean AWP really has no idea if Mr. Rice has used any confidential information or not.  Second, AWP alleges no facts that suggest Mr. Rice retained any AWP documents, media, or other repositories of proprietary data when he left AWP.  In most cases of this nature, the plaintiff is able to allege that the departing employee downloaded sensitive files to a flash drive, or emailed account information  to an outside email address, or even walked out of the office carrying a box of documents.  AWP alleges none of that, because, of course, none of that is true.  Third, AWP's allegations are conclusory allegations of the worst sort, and they contain no information about what confidential information was allegedly used, how it was used, or why it was valuable in the SJK start-up.  Absent these specific allegations, AWP's claim that Mr. Rice breached Sections 2(a) and 2(b) fails the pleading standard established by the Supreme Court in *Iqbal* and *Twombly*.

### E.     The Contract's Blue Pencil Provision, as well as Ohio Law that Permits so-called 'Reasonable Alteration,' Should be Rejected

To the extent AWP attempts to avoid the natural consequences of its overbroad restrictions by urging this Court to modify, or "blue pencil," the offending provisions, its invitation should be rejected.  Section 2(h) of the CNNA states that in the event the restrictive covenants are declared to be overbroad and unenforceable, the provisions "shall become and be immediately amended to only such area, duration and scope of activity as shall be determined to be reasonable and enforceable by the court or other body having jurisdiction over the matter . . ." Similarly, Ohio courts follow the so-called "reasonable alteration approach," pursuant to which courts will re-write overbroad and otherwise unenforceable employment agreements to render

them enforceable.  *See Raimonde,* 325 N.E.2d at 547.  Both the blue pencil provision in the

CNNA, and the Ohio "reasonable alteration approach" are contrary to Virginia public policy and

therefore should not be used by this Court to re-write the parties' contract.[4]

In *Northern Virginia Psychiatric Group, P.C. v. Halpern*, 19 Va. Cir. 279, 282 (Va. Cir.

Ct. 1990), the Court found that the "blue pencil" rule violates Virginia public policy because it

"conflicts with the Virginia Constitutional clause prohibiting interference with contracts.  *Id.* at

282 (citing Va. Const. Art. I, § 11).  The Court reasoned:

> [T]he saving clause in an employment contract which allows the court to narrow
> the effect of a restrictive covenant is against public policy.  In addition to
> questions about interference with contracts, restraint of trade, and other legal
> arguments, does the judiciary want to become the employer's scrivener?

*Id.*  Indeed, every Virginia court that has considered the "blue pencil" rule has rejected it on

similar grounds.  *See, e.g., Integrity Auto Specialists, Inc. v. Meyer*, 83 Va. Cir. 119, 125 (Va.

Cir. Ct. 2011); *Strategic Enter. Solutions, Inc. v. Ikuma*, 77 Va. Cir. 179, 185 (Va. Cir. Ct. 2008);

*Better Living Components, Inc. v. Willard Coleman & Blue Ridge Truss & Supply*, 67 Va. Cir.

221, 226-227 (Va. Cir. Ct. 2005); *Cliff Simmons Roofing, Inc.*, 49 Va. Cir. at 157-158; *see also*

*Pitchford v. Oakwood Mobile Homes, Inc*., 124 F.Supp.2d 958, 965 (W.D. Va. 2000) (surveying

Virginia law and concluding that Virginia courts "will not 'blue pencil' a contract to make it

enforceable."); *Roto-Die Co. v. Lesser*, 899 F.Supp. 1515, 1523 (W.D. Va. 1995) (same) (citing

*Alston Studios, Inc. v. Lloyd v. Gress & Assocs.*, 492 F.2d 279, 284 (4th Cir. 1974)).

---

[4]      A federal district court sitting in diversity applies the choice-of-law rules of the state in which it
sits.  *Klaxon Co. v Stentor Elec. Manf. Co., Inc.*, 313 U.S. 487, 496 (1941).  As a general rule, in
interpreting and applying contracts, Virginia courts apply "the law of the place where [the contract was]
made."  *Black v. Powers*, 48 Va. App. 113, 128 (2006).  Virginia courts will incorporate the law of a
foreign jurisdiction pursuant to a contractual choice of law clause, unless doing so would violate Virginia
public policy.  *Doulgeris v. Bambacus*, 127 S.E.2d 145 (Va. 1962).

These courts' uniform conclusions are not surprising, given the Virginia Supreme Court's repeated admonition that Virginia law requires that contracts be construed as written.  *See Landmark HHH, LLC v. Gi Hwa Park*, 671 S.E.2d 143, 147 (Va. 2009) ("[W]hen interpreting a contract, we construe it as written and will not add terms the parties themselves did not include.") (citing *TM Delmarva Power, L.L.C. v. NCP of Virginia, L.L.C.*, 557 S.E.2d 199, 200 (Va. 2002); *Bergman v. Bergman*, 487 S.E.2d 264 (Va. App. 1997) ("Where there is no ambiguity in the terms of a contract, we must construe it as written . . . and we are not at liberty to search for the meaning of the provisions beyond the pertinent instrument itself.").

In fact, some Virginia courts have recently held not only that "blue pencil" provisions are unenforceable, but also that their <u>very presence</u> in a <u>restrictive covenant renders the agreement itself unenforceable</u>.  *See, e.g., BB&T Ins. Servs.*, 80 Va. Cir. At 181; *Pace v. Ret. Plan Admin. Serv., Ltd.*, 74 Va. Cir. 201, 205 (Va. Cir. Ct. 2007).  This reasoning stems principally from the fact that the presence of a "blue pencil" provision subjects an employee to a perpetual lack of notice, as the employee can never be certain if, or how, a court might change his contractual obligations after he has acted.  In other words, the employee never receives advance notice of the actual contractual obligations to which he might one day be held.

Indeed, in *Lasership, Inc.*, the Court, citing several of the case cited immediately above, reasoned thusly:

> The underlying rationale prohibiting the "blue pencil" doctrine in Virginia is to prevent an "*in terrorem* effect" whereby an employee must try to interpret the legal enforceability of an ambiguous provision in order to decide whether it is prudent to accept a particular job. . . .  A contractual clause specifically granting the Court permissive authority to "reduce" or "modify" the invalid terms of a contract to render those terms enforceable does nothing to alleviate the *in terrorem* effect or overall clarity of the contract.  While it could be argued that such a clause clarifies the intentions of the parties to have a restrictive covenant enforced, it does nothing to clarify whether a court will choose to exercise this permissive authority.  Such a clause adds to the *in terrorem* effect and ambiguity

16

of these disfavored covenants because the extent a court may subsequently "reduce" a provisions terms will never be clear to the parties upon entering into the agreement.

*Lasership, Inc.*, 79 Va. Cir. at 216-217.

The *Lasership* Court's rationale is on all fours with the reasoning of this Court, expressed

in *Lanmark Tech., Inc.*:

> It is of no consequence that Lanmark asserts that it only intends to enforce the non-compete clause to prevent Canales from competing directly with Lanmark or assisting others to compete directly with Lanmark because a "request for limited relief cannot cure what is otherwise a defective non-competition agreement." *Cliff Simmons Roofing, Inc.,* 49 Va. Cir. at 158. Put another way, the contract must be interpreted as written; there is no authority to "'blue pencil' or otherwise rewrite the contract." *Pais,* 36 Va. Cir. at 239.

*Lanmark Tech., Inc.*, 454 F.Supp.2d at 531 (Ellis, J.).

For these reasons, the Court should not give effect to the "blue pencil" clause of the

CNNA or otherwise incorporate Ohio's "reasonable alteration approach." Rather, as required by

the Virginia Constitution and Virginia public policy, this Court should construe the parties'

contract as written, resolving all ambiguities in favor of Mr. Rice.[5]

## II.   Count IV:  AWP has Failed to Allege Sufficient Facts to Sustain its Claim for Misappropriation of Trade Secrets.

In Count IV of the Complaint, AWP alleges that Rice and the other Defendants

misappropriated AWP's trade secrets.[6]

---

[5]     It is worth noting that even under Ohio law, courts are permitted to modify covenants, but are not required to do so, and often will not modify covenants when the overbroad terms cannot be easily remedied. *See, e.g., Professional Investigations & Consulting Agency, Inc*., 591 N.E.2d at 1269-1270 (declining to modify covenant when modification would require court to "rewrite the entire covenant").

[6]     Although the CNNA includes a conflicts of law provision directing the Court to the laws of the State of Ohio, it is clear that Virginia law governs the tort and statutory claims. Virginia courts have consistently recognized that it is the place of the wrong (*lex loci delicti*) that determines which state's substantive law applies in a tort action brought in Virginia. *McMillan v. McMillan*, 253 S.E.2d 662 (Va. 1979); *Insurance Co. of North America, Inc. v. United States Gypsum Co.*, 639 F.Supp. 1246, 1248-1249 (W.D. Va. 1986). The place of the wrong for purposes of the *lex loci delicti* rule is the place where "the last event necessary to make an act [sic] liable for an alleged tort takes place." *Quillen v. International*

To establish a violation of the Virginia Uniform Trade Secrets Act, Va. Code Ann. §§ 59.1-336, *et seq.,* a plaintiff must allege and prove: (i) that the information at issue is a trade secret; and (ii) that the defendant misappropriated it. *All Bus. Solutions, Inc. v. NationsLine, Inc.*, 629 F.Supp.2d 553, 558 (W.D. Va. 2009). The VUTSA defines trade secret as "information, including but not limited to, a formula, pattern, compilation, program, device, method, technique, or process, that: (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy. Va. Code § 59.1-336. The VUTSA further defines "misappropriation" as:

> 1.    Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> 2.    Disclosure or use of a trade secret of another without express or implied consent by a person who
>
>> a.    Used improper means to acquire knowledge of the trade secret; or
>>
>> b.    At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was (1) Derived from or through a person who had utilized improper means to acquire it; (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (4) Acquired by accident or mistake.

*Id.*

In its Complaint, AWP offers nothing but conclusory, boilerplate assertions in support of its misappropriation claim. AWP alleges, for example, that its trade secrets include, but are not

---

*Playtex, Inc*., 789 F.2d 1041, 1044 (4th Cir. 1986). In this case, AWP alleges that all of the tortious acts occurred in Virginia.

limited to, "strategic plans for developing and marketing its services, customer and prospective customer lists, customer information and preferences, pricing, and employee compensation and benefits arrangements."  Complaint ¶¶ 13, 81.  AWP offers no other information about the nature of these alleged trade secrets, how they are used, or how they provide AWP a competitive advantage in its business.  AWP's allegations concerning Mr. Rice's alleged "misappropriation" are even more conclusory.  AWP alleges – "on information and belief" – that Mr. Rice "used AWP's confidential and proprietary trade secret information to help start SJK and to compete against AWP."  Complaint ¶ 45; *see also* Complaint ¶ 83 ("The Defendants have used improper means to misappropriate and exploit AWP's confidential and proprietary trade secret information to the benefit of themselves and others.")

These allegations are insufficient to state a claim for relief.  In *Preferred Sys. Solutions, Inc. v. GP Consulting, LLC*, 732 S.E.2d 676, 689 (Va. 2012), the Virginia Supreme Court affirmed the dismissal of a VUTSA claim because the complaint contained "nothing more than conclusory assertions."  The Court noted that:

> [t]he complaint, for instance, does not identify what trade secrets [defendant] misappropriated; instead, it simply references a laundry list of items that [plaintiff] considers to be "Confidential Information."  Nor does it identify the improper means by which [defendant] obtained the trade secrets or how [defendant] has used those secrets; rather, it merely states that "[defendant] used improper means to acquire and misappropriate [plaintiff's] Trade Secrets" and that "[defendant] used the Trade Secrets with a conscious disregard of [plaintiff's] rights and intending to ruin [plaintiff's] business, reputation and client relationships.

*Preferred Sys. Solutions, Inc.*, 732 S.E.2d at 689.

Indeed, courts in all jurisdictions routinely dismiss trade secret claims that fail to allege the nature of the alleged trade secret or the details of the alleged misappropriation with more than conclusory assertions.  *See, e.g., All Bus. Solutions, Inc.*, 629 F.Supp.2d at 558-59 (dismissing

claim where the plaintiff alleged a "single, conclusory assertion that [the defendant] 'sought . . .
to appropriate and disclose the names of [the plaintiff's] customers, along with other [of the
plaintiff's] trade secrets and confidential information" and "no additional factual allegations.");
*Medafor, Inc. v. Starch Medical Inc.*, 2009 U.S. Dist. LEXIS 61345 (D. Minn. July 16, 2009)
(dismissing claims where the plaintiff "failed to plead any facts to support its allegation that [the
defendant] stole its trade secrets" beyond the single fact that the plaintiff's former employee was
now working for the defendant); *Accenture Global Servs. GMBH v. Guidewire Software Inc.*,
581 F.Supp.2d 654, 663, 663 n.9 (D. Del. 2008) (dismissing claim because the plaintiff had only
alleged that it "assume[d] . . . that [the defendant] ha[d] 'somehow' obtained and used [the
plaintiff's] trade secrets"); *Knights Armament Co. v. Optical Sys. Tech., Inc.*, 568 F.Supp 2d
1369, 1377 (M.D. Fla. 2008) (dismissing claim where plaintiff gave "a formulaic recitation of
the elements of a cause of action").

   Apparently recognizing the deficiencies of its allegations, and perhaps as a hedge, AWP
alleges that, given the competition between AWP and SJK, "the continued use and disclosure of
AWP's confidential and proprietary information and trade secret information by the Defendants
is inevitable."  Complaint ¶ 52.  This allegation, of course, is woefully insufficient to survive a
Motion to Dismiss, inasmuch as a plaintiff may not succeed in an action under the VUTSA when
its claim of "misappropriation" is admittedly based on nothing more than "allegations,
speculation, and inference."  *Othentec Ltd. v. Phelan*, 526 F.3d 135, 142 (4th Cir. 2008).

**III.    Count VI:  AWP's Unfair Competition is Not Actionable Under Virginia Law.**

   AWP's claim for "Unfair Competition" must also be dismissed.  It is well-settled that
"Virginia continues to adhere to a narrow, sharply defined common law definition of unfair
competition, *i.e.*, deception, by means of which goods of one dealer are palmed off as those of

20

another," *Monoflo Int'l, Inc. v. Sahm*, 726 F.Supp. 121, 127 (E.D. Va. 1989) (Ellis, J.) (citing

*Benjamin T. Crump Co. v. J. L. Lindsay, Inc.*, 107 S.E. 679, 684 (Va. 1921)); *see also Corinthian*

*Mortg. Corp v. Choicepoint Precision Mktg., LLC*, 2008 U.S. Dist. LEXIS 28129, *11 (E.D. Va.

Apr. 4, 2008); *Mid-Atlantic Telecom, Inc. v. Long Distance Servs.*, 32 Va. Cir. 75, 77 (Va. Cir.

Ct. 1994).  Here, AWP has failed to allege any facts that suggest Mr. Rice or the other

Defendants attempted to pass off their goods and services as if they were the goods and services

of AWP.  To the contrary, AWP alleges just the opposite – that the alleged tortious activity has

been committed by the Defendants in competition with AWP in the name of SJK Service LLC.

*See, e.g.,* Complaint ¶¶ 38-53.  Accordingly, Count VI is legally deficient and should be

dismissed.

### IV.     Count V:  AWP's Business Conspiracy Claim Fails if AWP Cannot Prove a Predicate Unlawful Act.

Because AWP's other claims against Mr. Rice are legally deficient, Count V of the

Complaint, arising under Virginia's Business Conspiracy Act, Va. Code Ann. § 18.2-499 & 500,

must also be dismissed.  Causes of action arising under the Virginia Business Conspiracy Act

assert what is essentially derivative liability, and there can be no cause of action asserted when

no underlying tort or other unlawful act is present.  *Dunlap v. Cottman Transmission Sys., LLC*,

754 S.E.2d 313, 317-318 (Va. 2014).  In *Dunlap*, the Virginia Supreme Court held:

> Because there can be no conspiracy to do an act that the law allows, . . . we have
> held that "an allegation of conspiracy, whether criminal or civil, must at least
> allege an unlawful act or an unlawful purpose" to survive demurrer. . . . In other
> words, actions for common law civil conspiracy and statutory business conspiracy
> lie <u>only if</u> a <u>plaintiff sustains damages as a result of an act that is itself wrongful
> or tortious</u>.

*Dunlap*, 754 S.E.2d at 317-318 (emphasis added) (citing cases) (internal citations and quotation

marks omitted).

21

In this case, because AWP's underlying claims are legally deficient (for the reasons noted above) and its conspiracy claim is unable to stand on its own, Count V must also be dismissed.

## **CONCLUSION**

For all these reasons, all claims asserted against Mr. Rice should be dismissed.

Dated:  May 25, 2016                    By:   /s/ *Michael J. Lorenger*
                                        Michael J. Lorenger (Va. Bar #38910)
                                        Lorenger & Carnell PLC
                                        651 South Washington Street
                                        Alexandria, Virginia 22314
                                        (703) 684-1808 – Phone
                                        (703) 684-1805 – Fax
                                        mlorenger@lorengercarnell.com

                                        Counsel for Defendant David Samuel Rice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 25th day of May, 2016, I filed the foregoing BRIEF IN

SUPPORT OF MOTION TO DISMISS FILED BY DEFENDANT DAVID S. RICE with the

Court's electronic filing system, which will effect notice on counsel of record:

Bernard Joseph DiMuro
DiMuroGinsberg PC
1101 King Street
Suite 610
Alexandria, VA 22314-2956
Phone: (703) 684-4333
Fax: (703) 548-3181

Robert P. Ducatman
Jeffrey Saks
Candice Reder
Jones Day
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Phone: (216) 586-3939
Fax: (216) 579-0212


/s/ *Michael J. Lorenger*
Michael J. Lorenger